We'll hear argument next this morning in Case 17-17-12, Thole v. U. S. Bank. Mr. Stritz. Thank you, Mr. Chief Justice, and may it please the Court. My clients are beneficiaries of a pension trust. We allege that the trustees, through disloyalty and imprudence, caused the trust to lose $750 million. This suit presents a justiciable case or controversy for three reasons. First, my clients have an equitable interest in all assets of their pension trust. That is a property interest. And when $750 million of that property was lost, my clients suffered a concrete injury. Respondents are between a rock and a hard place. They can't argue that participants have an equitable interest in only some of the trust corpus, because the trust is unsegregated and undivided. So they're forced to take the incredible position, to quote their brief, that defined benefit plan participants have no interest in plan assets. If respondents were right, no one would have an equitable interest in any of the trust's assets. But a trust can't exist unless someone holds equitable title to its assets, and that someone here can only be the participants. Second, and independently, my clients have a right to loyal stewardship of their retirement savings. When respondents engaged in self-dealing, my clients suffered a concrete injury. Under the centuries-old no further inquiry rule, beneficiaries could sue even when there was no conceivable possibility of a financial loss. The breach itself gives rise to a case or controversy. In any event, and third, my clients have representational standing to vindicate injury to their plan. Since before the founding, when a trustee was unwilling to sue, equity courts allowed beneficiaries to do so on behalf of the trust. And so I'd like to begin with our property injury. A defined benefit plan under ERISA is a private exchange of services. Workers forego wages in exchange for a promise of a future payment secured by trust property. This is critical because there is an unsegregated, undivided pool of assets, the trust, that pays the pension of all the beneficiaries. So plan participants, like my clients, have an equitable interest in those assets. Does your argument depend upon a forward-looking theory of injury? In other words, it's one thing to have a conflict of interest or all the other things that you allege that lead to a situation that causes you no direct financial harm. But is your theory that, well, because they did that in this situation, and even if that didn't hurt us, somebody like that is likely to do it again, and that might hurt us? Or is it purely the fact of retrospective? If this person did something that under common trust law would be regarded as a bad thing, and under the no inquiry rule, that's enough, so you shouldn't worry about the fact that it didn't harm us at all? So the answer to that question is we have multiple concrete injuries here, and the things that we're seeking flow from the particular injuries, right? So what I'm talking about right now is our property injury. If we're right that we have an equitable interest in the assets, that theory depends on a diminution in the value of the trust asset. So I don't know. I wouldn't call that prospective. I would say the trust lost $750 million. And so — But what did your clients lose? I mean, your friend on the other side says they get nothing. They're in the same position if you win or if you lose. Well, I mean, I couldn't disagree with that more. There's always risk. Pension plans fail. Businesses fail. In 2008, AIG had $100 billion until they didn't. Well, those are other situations. They say in this case, well, just look at it abstractly. You know, say you need $600 million in your fund so everybody will feel comfortable. Your clients are going to get everyone's benefits. And, you know, there are $8 million in the fund, and there's some fraud that reduces it to 800 million to 700 million. Do you think you could sue on that misconduct by the trustee? Well, if the assets of the trust are lost and there's been a breach, yes. I don't think it's abstract at all. If I loan Bill Gates money and I take a security interest and he destroys the secured property, he encumbers it, he burns it down, I can still sue him even if he makes every progress payment and happens to have $100 million in assets because we recognize that having a security interest in something is concrete. Our core position — But I understood — I meant my hypothetical to suppose that the — your property is secure, your client's property, the beneficiary's property is completely secure. In the Gates hypothetical, I thought you were — you seemed to be suggesting the security that protected the interest of your loan was destroyed. Oh, but — But in my hypothetical, it may not be your case, but in the abstract, what's alleged to have been wrongfully done doesn't affect the financial security of your defined benefit plan. You can still sue because the person's a bad guy. No. You can still sue, but not because the person's a bad guy, but because your property interest has been impaired. I want to be very clear about this. To have an equitable interest — this has been the case since the 15th century — to have an equitable interest in trust assets, a beneficiary has never had to show that she's likely to receive the trust assets. As long as she has the possibility of benefiting from the assets, she has a present property right to prevent others from damaging them. That's the lesson from the contingent and discretionary cases. But what's the lesson from Article III? There has to be a tangible injury to the plaintiff. And under my hypothetical, if 600 million is enough to secure them against anything, and the trust corpus goes from 800 million to 700 million, how are they injured in the terms of Article III? In the same way that if I own property and you come and you put your toe on it, even though I never saw you, you didn't step on my tulips, you didn't upset me in any way, you impaired my property right. What if counsel — I mean, just to put the Chief's point in a finer light even than he has, which I think he's done an admirable job of, let's say this were a defined benefits plan rather than a defined contribution plan. And let's say that — sorry, this were a defined contribution plan rather than a defined benefits plan. And the menu of options is varied. Most of them are clean. But there is one option that's dirty, okay? But your client didn't invest in that. Sure. Could he still sue? I don't think — I mean, even in the law of trusts way back to the 15th century, there was a remoteness limitation on how far someone could sue, wasn't there? Well, so Justice Gorsuch, I think there wouldn't be standing, but it would have nothing to do with remoteness. Here's why. In a defined contribution plan, the assets are unsegregated just as in a defined benefit plan, and that's true. But they're not undivided. So the proper analog there would be — and this happened a lot — you had a trust, it held the deed to Whiteacre, it held the deed to Blackacre. We don't suggest that the person who had the beneficial interest in Blackacre could sue for a restoration of losses to Whiteacre. That's the case in a defined contribution plan. Okay. So there are Article III limits, then, on how far the standing, whatever is provided for by the statute here. Well, there are many limits. Just to be clear about the modesty of our position, first of all, from a historical standpoint, this is — what we're describing here in terms of the property interest impairment has more of — at least as much of a historical pedigree as key TAM suits in Vermont agency. And this Court has said time and time again that if suits existed at the time of the founding, it fit the definition of case or controversy from a constitutional perspective. If we do that — I don't remember the 15th century, surprisingly, but nonetheless, we did look up some things. And my — at least quick research suggests that there are different duties, fiduciary duties. One is the duty of loyalty. Another is the duty of prudence. And in respect to loyalty, yes, what you say, I think, shows pretty accurate. People with an interest in trust-like beneficiary can sue the trustee for breach of the loyalty, where he may be invested in a great investment for them, but he shouldn't have because it helped him to. But there was a duty of prudence, which seems what you're really interested in. And there, you couldn't. That is to say, they said that a life beneficiary could sue for loss of income. But if there's no risk of loss of income, he can't sue. A remainder man could sue to injuries to the principle of the trust, but that's all he has an interest in. And as long as that's safe, he can't sue. Now, if that's the right analogy, I would draw from that, yeah, you can sue for duties of a breach of loyalty, but not for duties of a breach of prudence. So a few responses, Justice Breyer. So loyalty is our second injury. I haven't gotten to that yet. The property injury is prudence. That is what I'm talking about. And there, the remainder man could not sue, it says. Absolutely. We're not a remainder man. Oh, you aren't? What is your interest in the money in the trust that is any greater, since it's fully interest in the income that's being paid out of a body, a corpus, which he will eventually get, which isn't hurt? The answer is we have an interest in a promise of future payment secured by the entirety of the trust corpus. And let me tell you about history. So the rule for present beneficiaries with a contingent interest has been settled since at least 1808, according to the English courts of chancery. I would point your attention to Allen v. Allen. This is 33 English reporter 704. Here's what the English courts of chancery said, and it's followed through in every case that I have seen. A present interest, the enjoyment of which may depend upon the most remote and improbable contingency, is nevertheless a present estate. Yes, that's you're talking about a contingent interest. A contingent interest is an interest in a certain set of — a certain property, a certain body of money. A remainder man had no interest. That's right. We have — But he would receive not a contingent interest. He had no interest in anything except the body. We're the — And it's hard to see a difference between that remainder man and the interest of a beneficiary. Here's the difference. The difference comes both from the planned document in this case and ERISA. Let's start with the planned document. It's pages 60 to 61 of the Joint Appendix. Here's what it says, and this is representative of every defined benefit plan I've seen. It says all of the planned assets, and that's not a contract, that stocks, bonds, investments, shall be held in a trust fund separate from the bank's assets. It says the trust assets can only be used to benefit the participants except as permitted by ERISA and the tax code. ERISA and the tax code are very clear. They prohibit taking or wasting any of the trust assets, including the surplus. So the point that's being made here, to what I believe you were asking, Mr. Chief Justice, which is a fair point, is, well, you may not need the surplus, so how do you have an interest? And our core submission is that since the 15th century, the way trust law has worked is it has conferred a property interest in the corpus without any case-by-case assessment. Alito, you have some strong arguments. I want to get this one question in before your time is up. I mean, you have arguments based on Congress having granted a right to sue, and you have arguments based on the analogy between trust law and ERISA. But an ERISA plan is not a trust in the normal sense of the word. Let's put all of that aside. I want to hear about practicality. So let's say a beneficiary of a defined benefit plan comes to you and says, I don't know anything about ERISA. I don't even know what it means. I don't know anything about trust law or the 15th century, anything like that. What I want you to tell me is, what is the practical chance, this is a beneficiary of this plan, that I am not going to get paid my benefits? What do you tell that person? So that's a totally fair question, and let me answer it in the context of this case. And I mean this very seriously. If you look at our complaint, Joint Appendix, page 90, paragraph 167, we pled because we believe that there was a substantial increased risk of default here. There was $750 million less. In answering the question. Alito, you pled that, but compliance with Article III has to be reassessed at different stages of the proceeding. Is there any? Is the risk greater than the risk of being hit by a meteorite? This is my core point, Justice Alito. As I think the best example of this is the Pension Rights Center's brief. They explain, based upon their experience, that the swings in funding of defined benefit plans changes incredibly quickly. The Harley case out of the Eighth Circuit, in one year there was a $600 million contribution, but the plan was 800 billion, $800 billion underfunded. Because of. I'm sorry, go ahead. Because of that, Congress exercised their judgment to say, we are going to confer a property interest in the entirety of the trust corpus, so we don't have to do a case by case assessment. But Congress made clear that not only the plan, but the employer, and then the PBGC which you haven't mentioned at all, is in play here. And the combination of the plan, the employer, and the PBGC, doesn't that make the practical answer to Justice Alito's question? Oh, I don't think that's a fair point. I don't think so at all. The PBGC, which has its own solvency issues. It does, but it's backed by the United States government. Not the full faith and credit of the government. What happens is there are premium payments, so it doesn't function that way. But more importantly, the PBGC doesn't fund anything above a minimum set of benefits. Here's the answer to the core practical question. But they exceed the benefits of your clients in this case. There are two things going on here right now. I want to be very clear. Is that yes? Yes, my two clients, yes. But there's two things going on here, Justice Kavanaugh, and it's really important to separate them out. What matters for standing, and why we care practically. I'm answering the latter one. And what I'm saying is in any individual case, you don't know whether you're going to need the surplus until it's gone. I think if the financial collapse in AIG and Lehman tells us anything, it's that. So if I am right that Congress said in exchange for a tax benefit, you have to put all of these assets in trust. You have to confer a property interest in the full trust. I'm right on standing, and there's an Article III injury. You don't have to inquire into the risk. But I also have a practical answer that doesn't matter for standing, but so that you don't have heartburn, you can see why a sensible policymaker would make that decision. That's precisely what they did, and that's precisely how many types of analogous trusts worked in an unbroken line of cases since the 15th century. Ginsburg. Before you finish, can you clarify the precise actions of the fiduciary that you are assailing in this case? Yes. First, the district court said that the challenge to the 100 percent equity investment is off the table because it's time-barred. So I think that that's out of the case. I don't agree. All right. Then you tell me. And then as far as the bank-affiliated funds, they say that they – the bank says it long ago got rid of all of them. Yeah. So here's what happened, Justice Ginsburg, and this is critical to procedural posture. May I answer, Your Honor? Briefly. I'll be brief. The first claim, the equities, was dismissed on statute of limitations grounds prior to this Court's decision in Tybill. We appealed. The Court never – the court of appeals never reached the question because it held that we have no standing. So you don't assume in doing the standing analysis that that claim is gone. The only reason that's gone is because we weren't able to appeal it. Based on this Court's decision in Tybill, it will clearly be reversed. Thank you, counsel. Mr. Joshi. Mr. Chief Justice, and may it please the Court. When a trustee breaches his fiduciary duties and causes losses to the trust, real money losses, the beneficiary always has been able to sue the trustee for the breach of trust. It's been the law for hundreds of years of trust law, and it's expressly in ERISA's text as well. And that rule makes really good sense. The beneficiaries are the ones who are getting paid out of the trust. The beneficiaries are the ones, as this Court recognized in Russell, who have an interest in the financial integrity of the trust. And the beneficiaries are in the best position to monitor and police the trustee for breaches of trust. And that's why the traditional rule, as my friend mentioned earlier, is that even contingent beneficiaries could sue a trustee. But the rule goes even further than that. If you read the treatises, even discretionary beneficiaries could sue a trustee for breach of trust. These are beneficiaries who have absolutely no entitlement to any trust assets except those that the trustee in his own discretion will give to the beneficiary. Nevertheless, a breach of trust would allow the beneficiary to sue that very trustee. That history, I think, decides this case.  MR. BOUTROUS. Let's be critical, then, about the defined contribution plans. Let's say the trustee is left with discretion. After everybody's paid, if there's extra, you can throw it to somebody, even though it's not in their own contribution plan. So I think you would say the result would be that every single beneficiary could sue, even if all of their investments are clean, for somebody else's defined contribution plan where the plan might be dirty. Is that right? Does that follow? MR. CLEMENT. I think that might follow, and I think it might. I do think it might. And I think that comes from not only our, you know, the position we've laid out in the case in trust law and the undifferentiated assets, but also from this Court's decision in LaRue. In LaRue, of course, this Court held that the plaintiff who was suing over harms to his own account nevertheless could maintain a suit under 502a2 for harm to the entire trust, because the trust included the account. The account was part of the trust. So I think on that theory, then, if you just extend it, that would have to be the logic. My answer would have to be yes. But I want to hasten to add that. As a practical matter, these cases, especially in the posture you just mentioned, are going to arise in the class context, and I think it would be perfectly reasonable for a court to look at that and probably likely to. What about Justice Alito's meteor? The likelihood of getting a discretionary benefit from the trustee might be less than the chance of being hit by a meteor. Would Article III have something to say there? You're suggesting now everybody can sue for everything anyway. So historically, trust law has allowed the beneficiary to sue the trustee, a discretionary beneficiary, to do so. And one might imagine when you sue the trustee, he's probably not likely to exercise his discretion in your favor. But nevertheless, you are allowed to sue. What Article III has to say about it, and I know there's a lot of doctrine around Article III, but I think the key point, and Spokio reiterated it and 50 years of case law has reiterated it, it comes from the words cases and controversies in the text of the Constitution. And the meaning of those words, at a minimum, includes the cases and controversies heard in the courts at Westminster and in the colonies at the top of the map. Isn't that the tension? I'm sorry. The tension in this case, as I see it, and I think it's a close case, is the history is strong, but the answer to the question, it's 99.99 percent certain that the benefits promised are going to be there. And how do we resolve what I see as that tension? Because it would be odd for us to grant standing in a case where the chances are so small. On the other hand, you're right about the history. I mean, you make a good point about the history. Yeah. I think the answer really is the history, but to the extent, you know, there's a chance, I guess I have two answers to that. One is this Court has and certainly the no further inquiry cases make clear that even when the trust benefits from a particular breach of duty, you still have standing, if you will, to sue. And, you know, one case out of many that we cited is Magruder v. Drury. That's a decision of this Court in which the trustee was making loans on trust notes and allowing the trust to acquire those notes. And it was on, there was no question that it was on beneficial terms and there was no question that the trust benefited because it could make these reinvestments and save brokerage fees. Those are in the facts of the decision of this Court. Nevertheless, the Court said that, you know, not only did the beneficiaries have standing to sue, it didn't discuss standing, but they were entitled to recover. So that's one answer. The other answer to your question is no matter how low the risk might be, as my friend mentioned, PBGC tells me that plans that are highly overfunded the next year become underfunded. So it's a practical matter you don't know and more important. What is the role, I'm sorry to interrupt, but the PBGC, how should we think about that if we get away from the history at all, its role and how it guarantees a backstop? I don't think it matters at all. No one has ever suggested that the mere fact you might have insurance means you don't have standing to sue someone for the harms they've caused. It's the combination of the plan plus the employer plus the PBGC would all have to The fact that there may be many layers of insurance, if you will, doesn't change the fact that when a trustee breaches his fiduciary duties, you can sue. How far can you push the analogy to trust laws? Since, was there a trust where the settler of the trust had an obligation to step in and increase the amount of money in the trust in order to ensure that beneficiaries would be paid? Not to my knowledge. I mean, that's the big difference between the situation here and trust law, right? I don't think it's different. I don't think it's a distinction that makes any practical difference, at least for Article III. It is an additional protection that the drafters of ERISA wanted to make in addition to making the plan its own entity. Those are all additional protections for beneficiaries precisely because in Congress' judgment, as this Court laid out in footnote 8 of Russell, trust law was not protective enough of beneficiaries. And here's the point, and this is to finish my answer to your question, Justice Kavanaugh, to merely say it's highly likely you're going to get your money back is you might say that if, for example, to pick up on my friend's analogy, you know, you were to loan money to Bill Gates. You're pretty sure he's going to be able to repay your money. But the difference between having the repayment or the money you're entitled to come as a result of a contract and come as a result of a trust is very different. You get a very meaningful benefit from having your money come from a trust, and that is it's managed by a fiduciary. Breyer. Can you just give me a – do you want to finish? Go ahead. Yeah, sure. All right. Just don't spend more than 15 seconds. But what in the law – see, the stock market goes up and down. And every time it goes down, it's underfunded. Every time it goes up, it's overfunded. Okay? Once it's overfunded, everybody's just as well off as they were before. Now, that happens probably quite a lot. Now, if we – what in the law prevents a class action every time it goes down, and then it goes back up and they're better off? And you say, well, that's what we were talking about yesterday. What prevents – something should prevent that. Now, what is it that prevents that? Well, I'm not certain what context you're talking about. I'm just saying the standing thing might be one of the things that prevents that. Because – and you can say, well, they have to have a good case. All right. I understand that. But is there anything else in the law except this standing business that can protect against that? If you have suffered an injury of a peppercorn, you have standing to sue. Now, there might not be – there might be other things that – Of course, I want to say, okay, your answer is nothing protects in the law. Well, again, it's hard to answer that question in the abstract. What I do know is that in this particular context, there are trust duties that are set forth in the law. I know for some, but this is a duty of prudence, which means you made a bad investment that – and you do make bad investments, and you can say, well, the trustees say da-da-da. Okay. But I wonder if there is anything that prevents against the roller coaster, which would mean many, many suits, even though the beneficiaries are even better off sometimes after the stock market's finished its little roller coaster. You're saying nothing. Okay. I got the answer. Well – Aren't you saying – I'm sorry. Aren't you saying the deference afforded to the plan administrators on the merits is – That's what – If properly applied. That's exactly right. And I think to – if you just look at it, you know, the funding rules in 303 and the Okay. All in the merits. I see. They all apply at all times. I see. Well, I'm not sure you're giving adequate weight to the – when you're looking at the history, the significance of Article III to our role in the separation of powers. The requirement to decide an actual case or controversy is the only thing that gives us authority to do what we do. And so the fact, while you say in history in, you know, 14-whatever, you didn't need to show that, well, that doesn't necessarily take into account how Article III works today under the Constitution. That may be right. But as I said, the Magruder case and many others that we cited in the briefs do recognize this principle of trust law. And I'd also point out that nobody disputes that if the allegations are true, that the plan's loss of $748 million, if I may finish, is a injury to the plan, and the plan itself would have standing to sue. But, of course, the plan's not a human being. Someone has to sue on behalf of it. And when the trustee is the one that has caused that loss, the one person who's going to step into the shoes to sue for the plan's injury is the beneficiary. Roberts. Thank you, counsel. Mr. Palmorey. Thank you, Mr. Chief Justice, and may it please the Court. There is no ERISA exception to Article III. Like all plaintiffs in Federal court, those with ERISA claims must demonstrate injury. Neither Petitioner here can do that. This month Petitioner James Thull will receive a pension payment of $2,198.38, just as he has every month since his retirement from U.S. Bank. And Petitioner Sherry Smith will receive the same $42.26 payment she has received since her retirement. If this Court affirms dismissal of all of their claims, it is undisputed that those payments will be exactly the same every month for the rest of their lives, not one penny less. If, on the other hand, this Court were to reverse, this case were to be litigated to judgment in favor of plaintiffs, and they were to receive every single form of relief they demand, those payments would also be exactly the same, not one penny more. Federal courts are not available to adjudicate claims like this that do not matter to the plaintiffs. Whether viewed as a matter of Article III or statutory standing, none of Petitioner's arguments solve that fundamental problem with their case. First, at trust law, beneficiaries could sue to challenge fiduciary breaches only when they affected their interests. Unharmed beneficiaries could not sue. Second, Petitioners lack any property interest in the trust underlying this defined benefit pension plan. That is because, as this Court explained in Hughes Aircraft, their level of benefits is unconnected with the value of the assets in the trust corpus. U.S. Bank, not a participant, bears the risk of loss from poor performance, and U.S. Bank, not a participant, benefits from plan overfunding. Third, Petitioners cannot sue in a representational capacity on behalf of the plan unless they have their own injury in fact. For the reasons just stated, they don't. Mr. Stris started off by saying that they have a property interest in the plan. But under the structure of ERISA and under Hughes Aircraft, they don't. The trustee owns legal title of the plan and owns the equitable interest in the plan is the plan itself holds the equitable interest in the plan. The fact that they have no right to sue over the fluctuations, the ups and downs in the value in the trust corpus is actually entirely consistent with the history at trust law. They don't have a contingent interest in the plan in the sense of if A happens, they may inherit all of the trust corpus, or if B happens, their benefits may get up, may go up. They have no such interest. And at trust law, a plaintiff or a beneficiary whose interest was completely unconnected to the value of the trust could not sue. And we've cited the Boggart Section 871 for that proposition, the Restatement Second on Torts, Section 214, Comment B, all stand for that proposition. That's a different situation if you have a contingent beneficiary situation where there are two beneficiaries. Can you imagine a situation in which a participant in a defined benefit plan would have standing? And can you describe the particular line that would separate that from this case? Yes, Your Honor. I think a participant in a defined benefit plan would have standing consistent with normal, black letter, Article III principles if they could show that there was a risk to their benefits. And how would they show that? How would they show that? Well, they could show, A, I'm not getting paid, what I was promised. Okay. Put aside the not getting paid. Right. But if they're still getting paid, how would they show what would be the particulars that you think would be necessary? Well, I think, you know, I don't think, first of all, I would just preface my remarks by saying I don't think this case calls for the Court to opine on that. I understand that. Because they've said that there's no risk at all that's required. But I think this Court, I think it would be simple factual application of Clapper where the Court talked about imminent risk or a substantial risk. Right. I know the terms. I'm just trying to figure out how. Well, I think those terms are flexible enough to take into account the long-term time horizon of a pension plan. So I don't think you would have to show that the plan was going to fail tomorrow. But I think it's not – wouldn't be enough to show that the plan was simply underfunded. The Fifth Circuit's – Well, let me pause there. What's the delta between you can take into account the long-term likelihood and underfunded? It seems like pleading – I guess my point is pleading what you think is necessary won't be as big a hurdle as you're implying, I don't think. Well, I think you would have to plead not only was the plan at risk, but that the employer either could not or would not fulfill its legal obligation to make up any deficit in the plan. So the Fifth Circuit's case in Lee v. Verizon is instructive. Here, that was post-Spokio. That was a GVR case in which the Verizon pension plan was actually only 66 percent funded. But what the Fifth Circuit said was that the plaintiffs there hadn't adequately alleged injury because they hadn't alleged that Verizon, one of the biggest companies in the country, would be unable to fulfill its legal obligations to make up that deficit and to make good on their payments. Well, what we've had – in the not-too-far-off past, there have been situations where people were surprised at some of the companies that turned out not to have enough money to go forward. And let's say that the person running the trust or, you know, running the company loses $100 million in the first month and $100 in the second and $100 in the third. And although there's no significant harm to the beneficiaries in the terms that you've discussed it, they look and say, well, this guy is going to continue to lose a lot of money, and can they bring a suit in that case? If they can show he's going to continue to lose a lot of money and it will result in an impairment of their only interest, which is the stream of payments from the pension plan, then, yes, they can bring a suit and they can get an injunction to have him removed. Here, they've never established that or claimed that here. I'm sorry. I don't know why we need all that. Meaning there's a simple – two simple claims here. One, a breach of loyalty that they invested in a vehicle that cost more money than was needed, and it was self-dealing. So trust law has always said you can't self-deal. You can't make money off of the assets of the plan. So whether or not they get something or don't, trust law has been clear forever that that belongs to the trust. And the plan participants have trustees who are self-dealing. They're not going to sue for themselves. We can sue for that self-dealing. Secondly, the plan lost $750-odd billion or whatever the money was, millions, in impotent investment. Now, whether we lose money or not, the plan lost money. It lost $753 million or whatever the figure was. And, in fact, until you contributed $311 million of that $753 million, the plan was underfunded. You then came along and said, well, we'll give that much a part of that loss but not the whole. And so if the trustees are not going to give the whole amount because it's not in their best interest but it's in the plan's best interest, what does it matter whether the participants get a piece of that or not? The plan gets it, and they're representing the plan. So I guess what I'm having trouble with in this case is that they're right. Whether they have a property interest or they have a representational interest, they still have standing. Your Honor, first of all, they don't have a property interest for the reasons I stated and the reason this Court explained in Hughes Aircraft. They don't have a property interest in the trust corpus. Well, let's remember the following in Hughes. They were seeking a distribution of a surplus that the Court said they couldn't seek. But here, they're not asking for a distribution to themselves of a surplus. They are asking for a payment to the plan. Right. But Hughes rejected that claim on the merits because of the structure of defined benefit plans. But if I could move to the representational standing question that you asked, a party can sue on behalf of another only if that party has their own injury. That's Perry v. Hollingsworth. There are many such cases. So in a Ketam case, the relator will personally recover and get money. In a derivative action, the plaintiff owns a share of the corporation, so any benefit to the corporation will flow down and they will get a minute part of it. And if they don't, this Court explained in Gallas v. Mendel, there's an Article III problem. With respect to the first part of your question, which is the no further inquiry rule, I think it's critical to understand there are two separate questions. How is harm established? And then who has a relevant injury to sue to remedy that harm? The no further inquiry rule went only to that first question. It said that if the trust engaged in a transaction that was inconsistent with the duty of loyalty or was otherwise prohibited, there would be a presumption of harm to the trust and, therefore, that transaction could be rescinded. But there is always they don't need the presumption here. They've alleged harm to the trust. There's always a separate question of whose interest is implicated by harm to the trust. Roberts, counsel, on that, what if Congress had in its statute, I know you would disagree that it did this, what if it had said that every beneficiary has a property interest or a private right to a completely clean trustee? Would that suffice for standing in your view? I don't think so, Your Honor. Of course, I don't think you have to address that question. But as Spokio explained, there are limits on Congress's ability to provide causes of action and to identify injuries and make violation of them concrete. This isn't creating a cause of action. I agree with you about all that. I understand your point. But saying you actually have a right, a legal right, creating a new, and we know this is new. We admit it's new. Yeah. But we think it's important because whatever policy reasons, some of which we've heard articulated here. Well, I think this Court would look to the substance of it. I think if they just label it a property interest. I don't think that would be good enough. If they somehow tied the level of benefits to the value in the trust corpus, this would be a whole different ballgame and they clearly would have standing. But like we talked earlier about the questions about the contingent beneficiaries. If you had two beneficiaries at common law, they each had a 50 percent chance of getting the trust corpus. Yes, they had standing at common law because they did have an equitable interest in the trust corpus. They might get all of it. Here, we're not talking about 50 percent. We're talking about zero percent. These Petitioners will never get any of this money. Mr. Palmore, regardless of whether it's zero or 50, if I understand your argument, you are acknowledging that if they have an equitable interest, then they have standing. Is that correct? If they had a property interest in the trust corpus, an equitable property interest, then, yes, a loss of a dollar from the trust corpus is a loss of a dollar to them. But they don't. That's the critical point. But that's what everything depends on in your view. I mean, your argument just falls apart if we look at ERISA and we say that's exactly what Congress did here, was to give all of the beneficiaries and participants an equitable interest in the integrity of the trust. And I don't want to quibble over terminology, but I would say an equitable property  If they did and the reals. That's what I – yes. Yes. We're not talking about. Then perhaps, but they didn't. The plan is – has the equitable interest and the fiduciary duties run to the plan. And moreover, with their title – And where do you get that from? What does that mean, that the plan has the equitable interest? I mean, the plan is the thing that there's an interest in, isn't there? No, Your Honor. This is the structure of an ERISA plan. You have a legal title is owned by the trustee, and the trustee holds legal title for the benefit of the plan itself. And this Court explained in Russell that the fiduciary duties run to – for plan asset management run to the plan. But even if you don't agree with that, I think the history here is still critical because at common law, a remainderman couldn't sue – and this is Terry v. Allen. It's the Connecticut Supreme Court case that we cite, Justice Breyer. The remainderman who had an interest in only the trust principle was a beneficiary, but could not sue, didn't have standing to sue for mismanagement of that trust corpus because a bond protected his only interest, which was a certain payment. Here, U.S. Bank is the bond. We're talking about one of the best capitalized banks in the country. There is no risk that this plan was not going to be able to make good on the stream of payments to these plaintiffs, and that is their only legal interest. It's getting that check every month. Now, if they could just – Alitoson Do you think that the – I didn't quite understand your answer. Do you think that Article III is satisfied whenever Congress puts the label property interest or equitable interest on something? No, Your Honor. I didn't mean to suggest that. I don't think the label would matter. I was trying to suggest that if it were substantively a property interest – What does that mean for it to be substantively? I think if their benefits were tied to the value of the trust corpus, then they would have standing. But if their benefits are fixed, as these benefits are, then – and they can't show that any harm to the trust corpus actually jeopardized that stream of payments, then they don't have standing, just like the remaindermen in Terry v. Allens. It's a little different, though. I'm sorry to interrupt. It's a little different because we're talking about a predictive judgment, right? And the plaintiffs are going to say there's an increased risk of harm. Of course, in regulatory cases that we've done, we've confronted that issue. And how much of an increased risk of harm that they won't receive the payments is necessary? And isn't that just going to be a pleading exercise that presents a whole new collateral set of cases, trying to figure out have you pled exactly enough increased risk of harm here? And I guess the bottom line is, is that worth the candle? I guess summarizing, if we don't have clarity on the line, is it worth the candle of trying to draw a line rather than just going with the historical approach advocated by the other side? Well, Your Honor, to put a footnote on it, I disagree that the history is on their side. Right. But I think it is worth the candle because Article III requires it, right? So Article III and Iqbal and Twanley would require proper pleading. So here they said – I obviously agree with that, but you've been referring to these old cases which kind of said you're out. And you're not saying you're out if you're a participant in a defined benefit plan. You're in so long as you can allege a sufficiently increased risk of harm that my benefits won't be paid. And then the question becomes, what do you have to allege to that? Well, it's underfunded, and therefore there's – and the company may go belly up, and therefore that's enough. Yeah. I think if it was significantly underfunded and the company was struggling or was distressed and didn't have adequate assets – Well, that's just going to be a whole mess, isn't it? But that's required in order to show that you have an injury. So I don't think it's a whole mess. There's a ton of information available here. So you look at the facts of Clapper, those plaintiffs had literally no ability to demonstrate that their calls were being surveilled. Here, pension plans file annual reports with the Department of Labor. That's the Form 5500. There's ample public information about publicly traded companies. There's a lot of information out there. And that information here showed that even at the time this plan was modestly  Well, I mean, the standard – Article 3, there's a lot of case law about what standard the injury has to satisfy. And if you're analyzing this under Article 3, that's not an open issue. Concrete, particularized, and so on and so forth. That has come – developed through all sorts of cases where there's a challenge to the nature of the injury. No, that's absolutely right. So I think it really would be a fact-bound application of Clapper, of the imminent harm standard in Clapper, or the substantial risk standard in Clapper, which the Court talked about. But what's – But – sorry to prolong it, but it's bothering me. If you just allege that it's underfunded significantly, and therefore, in the complaint it says, and there's therefore a substantially increased risk of harm, I won't receive my promised benefits, is that enough? That wouldn't be enough. Okay. What more is needed? I think – and this, again, would be the Fifth Circuit's decision in Lee, which I would commend to the Court. Okay. So you agree with – I just want to make sure you agree with the Fifth Circuit's formulation. We do. So underfunded isn't enough because of the way that ERISA is structured, that the employer is always on the hook to make up any deficit in that plan. So you've got – we'd have to allege both underfunding and an employer who was unwilling or unable to examine the problem. Well, Senator, I agree with the Chief Justice that I've seen numerous cases, and whenever it's a question of standing and it's a money case, which this is, you have to have some injury to money. All right. But we have two things. One, at least as to the duty of loyalty, the history seems to show that those were no injury to the individual beneficiary or trustee beneficiary who could have – that's true of the duty of loyalty. Under the – that's what we've looked at, the sites, and they seem to say that. I respectfully disagree with that. All right. Okay. I want to know that. But the other is this. There are exceptions to this harm business quantitatively. The Sierra Club. I mean, their members can sue. And I agree that the members have to have once taken a, you know, a look around Yellowstone or something, but I mean, it's pretty minimal. And here Congress has tried to create an organization that involves pensions and, you know, the members that they list in the statute as being able to sue. So why isn't that good enough? Why isn't it good enough that Congress has created something like an association, associational members do have the right to sue even though there's nothing more than their belonging to an association that suffered? Shouldn't that be an analogy? Why not? No, Your Honor. So I'm interested in both of them. Sure. First of all, under Rains v. Byrd, the simple conferral of a cause of action is not enough to confer standing. And what you're alluding to in 502a-2 and a-3 is simply a bare cause of action. That's not enough. There has to be an invasion of a statutorily protected right and there has to be a concrete injury. At the very least, though, Mr. Palmore, that suggests who Congress thought the fiduciary obligations ran to. In other words, this goes back to this question of who really owns this thing equitably? Is it the plan or is it the beneficiaries and participants? And in creating those causes of action, Congress essentially, you know, indicated that it thought that the obligations ran to the beneficiaries and the participants, meaning that it's the beneficiaries and the participants who have the equitable ownership stake in the financial integrity of the fund. Your Honor, I read this Court's decision in Russell to be say exactly the opposite. So 502a-2, which goes to claims for fiduciary breach involving plan asset management, which is what we have here, the Court was quite clear that those fiduciary duties run to the plan, not to individual beneficiaries. But even Russell said that beneficiaries have a stake in the financial integrity of the plan, and then you have Harris Trust, which says that ERISA gives a fiduciary It makes clear that the fiduciary duty goes to the beneficiaries. Your Honor, what this Court said has said in subsequent cases after Russell was that there are other kinds of fiduciary duties which may run directly to a beneficiary. So, for instance, the right to receive truthful information. But the Court reiterated, in verity, that the fiduciary duty with respect to plan asset management runs to the trust. But even if you don't agree with me on that, the fiduciary duty runs to the trust. And the fiduciary obligations runs to an abstract plan rather than the beneficiaries and the participants who are supposed to benefit from it? No, Your Honor, because ERISA was an innovation in that it created the plan as an actual legal entity with the – and a heavily regulated one. At trust – at common law, the trust itself wasn't a legal entity. It was just a series of relationship between individuals. So ERISA was an innovation. But even if you don't agree with me on that, the question would still remain, even if the fiduciary duties flow to the individuals, can they sue if they're not harmed? So if at the contingent beneficiary analogy that we've been talking about, if we have two contingent beneficiaries, either of whom could receive 50 – might have a 50 percent shot at getting the trust corpus, here it's a 0 percent shot. None of these – these Petitioners is going to get that trust corpus. And again, the – Justice Breyer, going back to your question, the no-further inquiry rule involved only how you establish harm to the trust itself, to the trust corpus. In not one of their cases do they cite an example of a beneficiary whose concrete financial interests were not tied to the value of assets in the trust corpus? In not one of their cases was that beneficiary able to sue. Breyer, if you don't have to assess injury to the trust, where there is no injury to the trust, how could there be any injury to a beneficiary of the trust? Because there was presumed – under the no-further inquiry rule, there was presumed injury to the trust. It means sometimes you presume that there is injury to the trust when there isn't. Yes. All right. Focus on those. Correct. In that set of cases, there is no injury to the trust, and therefore, a fortiori, there is no injury to the beneficiary. I would – I would change your wording slightly. There is a presumed injury to the trust. There is a presumption of harm to the trust. On the duty of – on the duty of loyalty. Yes. There is a presumed injury to the beneficiary. To the – to the trust. Oh, there's a presumed injury. To the trust. And then any beneficiary with an interest in the trust could then sue. So if it was the remainderman who had only an interest in the principal, like the plaintiff in Terry v. Allen, and that that interest was fully protected, that plaintiff couldn't sue, right? So there – it's critical to keep those two separate questions in mind. How is harm established? Is it either proved or conclusively presumed under the no-further inquiry rule? But there was always the second question, and this is Boggart 871, Restatement 214, Comment B. There was always a second question of who can sue to remedy that harm to the trust. And there the trust law is quite clear that that who is someone whose actual concrete interests were affected. Can I go back to the particulars of your theory of what would be sufficient? Yes. You said if the plan – if you allege that the plan is underfunded and you allege that the employer is unwilling or unable to meet the obligations, I think you said? Yes. Okay. Let's put aside unwilling for a second. Alleging that an employer is unable to meet the obligations, how would you allege that? What do you think would be necessary? I think you would have to look at their – you know, their publicly disclosed financial information and show that they – that this was a seriously underfunded plan and that this was a distressed company and it was going to be unable to put in adequate money or unable to comply with the minimum funding requirements that ERISA places on them. If it's alleged, how can that be disputed at the pleading stage or what do you envision – what kind of process do you envision for disputing an allegation to that effect in a complaint? Well, I don't – I mean, I think if it's – if it's alleged with sufficient particularity, then they probably properly allege standing and then there would be a factual question down the road. Yeah, but then you would – then it's a question of subject matter jurisdiction under Article III. So it's not like Iqbal and Twombly where it's valued as a question of whether it's stated a claim. Wouldn't you immediately file a motion to dismiss for lack of subject matter jurisdiction? And that wouldn't be – the determination of that would not be based solely on the pleadings. Exactly right, Your Honor. And that's actually what happened here. We dismissed under 12b – we moved to dismiss under 12b-6. That was denied. I think that was incorrect, but it was denied. And then we made a motion under 12b-1 and the district court actually engaged in fact-finding and found as a matter of fact that there were – there was no risk to these beneficiaries. Right. That's what I was getting at. Because the plan was actually overfunded. I think that's right. You have a separate factual proceeding on whether the allegation that the employer wouldn't be able to meet the obligations. Exactly. And that's actually what happened here. The plan then was overfunded. And the overfunding line, that's the line that Congress has drawn. It says if you meet that level of funding in the plan, there's enough there to pay all the future benefits. So this plan at the relevant time was overfunded. That was the basis for the dismissal here. And I think that, yes. And, Mr. Palmer, what do you do about the fact that these plans can be underfunded in January and overfunded in February and underfunded in March again? And what do you do about the fact that the health of even, you know, secure companies, if you're in 2008, all of a sudden it turns out they're not so secure after all? Well, Your Honor, I think that's why the – I think if a plan is overfunded, I think that's sufficient to defeat standing. I don't think it's actually necessary. And I think for the reasons that you state, if something is toggling between overfunded and underfunded, there isn't going to be standing unless the critical second step of the inquiry can be alleged or factually determined at the 12B1 stage that the employer won't be able to meet its legal obligations to make the minimum funding contributions to make sure there's enough money in that plan to ensure the stream of benefits. But just kind of speculation about AIG and maybe there'll be another market meltdown, that's clearly not enough under Article 3. And especially – and if that's their theory, they picked the wrong defendant because there were, you know, $86 billion in liquid assets. Under your theory, the PBGC doesn't matter, correct? I think the PBGC does matter. You did not articulate that when you articulated it. Yeah, well, we articulated that in our brief and the courts of appeals cases that are all on our side do articulate that as well. That's the ultimate backstop and that's funded through insurance premiums paid by the employer. So it's not what my friend on the other side said, that the beneficiary somehow had their own insurance that would cover the loss. This is part of the employer's obligation to pay these premiums so that there is an ultimate backstop. Wouldn't that theory taken to its logical conclusion mean that a participant could never sue? It defined benefit, participant or beneficiary could never sue? No, Your Honor, because the PBGC guarantees benefits only up to a certain level. Anyone whose benefits are under that limit, they could never sue? Is that your theory? That would be a theory, Your Honor. Is it your theory? Yeah, it is my theory. I don't think you need to actually adopt that theory here, because U.S. Bank by itself was fully sufficient. But to the extent, again, that there – and to the extent that there is no employee or defined benefit, beneficiary whose benefits are at risk, and so they therefore wouldn't have standing, first of all, that's not a reason to find that they're standing because there are other enforcers, the Department of Labor, co-fiduciaries. But that's actually a good thing, not a bad thing. It means that the employer stands ready to make good on the pension payments, just as U.S. Bank does. I'm having a very – You went quickly over to the Department of Labor, but we've heard from the Department of Labor, they can't do this job. There has to be someone who is able to sue. And it's not going to be the trustee, because the trustee is the one who is alleged to engage in imprudent or impermissible transactions. So the only one possible is the planned participant. So the government itself is telling us, Congress set this thing up, depending on the participant's ability to sue, because the Department of Labor just doesn't have the resources to do the job. May I answer? Yes. The Department of Labor has the legal authority to bring in action. Co-fiduciaries have a legal authority to bring in action. Trustees can bring in action. You have to look no further than this Court's own cases. Harris Trust is called Harris Trust because the plaintiff there was the trustee that was suing to rescind a transaction. And in this very case, there was an early claim about a securities lending program that fell out because U.S. Bank had taken action against an employee who had committed misconduct and had recovered that money for the plan. So there are plenty of other tools available other than fiduciary lawsuits brought by uninjured parties. Thank you, counsel. Three minutes, Mr. Schrist. Thank you. Three brief points. The first two have a lot to do, I think, with question begging. So the first is we have a concrete property interest. If we lose that argument, we lose, but saying that we're uninjured doesn't do the work. Justice Alito, you, I think, asked a question that's very important. You said, well, can Congress put a property label on anything? And I think that goes to the heart of this case because they can't and they didn't. Here's what happens in an ERISA plan. Private parties make a bargain with real private interest and real money. A worker gives up wages in exchange for a promise to be paid in the future with money put in a trust as security. That's all fact. No one can dispute that. The question is, do we have an interest, my clients, in the trust, and what is that interest? So let's sweep aside the question begging and get to the main issue. Our point is it's always been the case since the 15th century that we have an interest. At first, my friend doesn't dispute this. Look at page 25 of their brief. He says, in the 15th century, chancellors began to recognize the beneficiary's interest as a form of ownership, protecting it much like the common law treated the legal interest in property. This is why he spends much of his brief and he gets up here today and he says, ah, the participants, the beneficiaries, they're not actually the beneficiaries. The plan is the beneficiary. If he's right, we lose. But he's obviously wrong because the beneficiaries are the beneficiaries. To your questions earlier, Justice Kagan, you don't need to look any further than the congressional statements of purpose. Everything in ERISA says that to protect the interest of these individuals, we're putting the money in the trust. So that's the property interest. There's nothing abstract about it. That's how it's been for a while and for good reason. Okay. I'm going to take my points out of order. The second one is the practical concerns. What is the good reason? Because I think there's a reason why the United States government across a number of administrations have endorsed this position of standing. It's because, Justice Breyer, you say in prudence cases, well, maybe standing should be a gatekeeper because can people sue in every case like when there's been a law? I get it. That's a concern. I don't think it should inform the standing inquiry. Think of the flip side. The flip side is if their rule is correct, you will have to have to figure out if there's an injury, a battle of experts in every case about the level of risk, and potentially throughout the case about the level of risk. Entirely unworkable. Again, this shouldn't drive standing, but if it's the elephant in the room. And in situations of catastrophe like AIG and Enron, there's no solution. We ask that you reverse. Thank you, counsel. The case is submitted.